UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
PAMELLA CORTES, LETICIA GONZALEZ and
ARIANA REYES, on behalf of themselves and
all others similarly situated,

        Plaintiffs,

        -against-                    17 Civ. 03942 (RER)

JUQUILA MEXICAN CUISINE CORP. d/b/a
JUQUILA MEXICAN CUISINE, JUQUILA KITCHEN
AND BAR CORP. d/b/a JUQUILA KITCHEN & BAR,
TEOFILA MENDEZ, and CRISTOBAL BONILLA,

        Defendants.
------------------------------------------------------------------------X

## PLAINTIFFS' POST-INQUEST DAMAGES CALCULATIONS

Based on the evidence entered in this matter, Plaintiffs Pamella Cortes, Leticia Gonzalez, Ariana Reyes, Lucia Isabel Rivera, and Blanca Nelly Ayala (collectively, "Plaintiffs") respectfully request that the Court award damages to each of the Plaintiffs in accordance with the following information.

**1. Relevant Facts from Inquest**

   **a) <u>Plaintiff Pamella Cortes</u>**

   **(1)** Plaintiff Pamella Cortes ("Cortes") worked for Defendants from January 2016 to July 2016. (Tr. 58:24-59:3).[1]

   **(2)** Cortes worked as a waitress while employed by Defendants. (Tr. 58:6-7).

   **(3)** Defendant Teofila Mendez ("Mendez") hired Cortes to work at Juquila Mexican Cuisine Corp. d/b/a Juquila Mexican Cuisine. (Tr. 61:5-6).

   **(4)** Cortes was paid $4.50 per hour. (Tr. 61:14-62:13).

   **(5)** From January 2016 to in or about April 2016, Cortes regularly worked six days per week during the overnight shift, from approximately 11:00 p.m. to 6:00 a.m. (Tr. 59:10-24).

---

[1] All references herein to "Tr. ____," are to specific pages and lines of the transcript of this case's inquest testimony.

**(6)** From in or about mid-April 2016 to July 2016, Cortes was regularly scheduled to work six days per week during the daytime shift, from approximately 9:00 a.m. to 5:00 p.m., and/or during the evening shift, from approximately 5:00 p.m. to 11:00 p.m. (Tr. 59:25-60:6).

**(7)** From in or about mid-April 2016 to July 2016, Cortes was scheduled to work double shifts approximately once or twice a week, which consisted of working the daytime shift from 9:00 a.m. to 5:00 p.m. and the evening shift from 5:00 p.m. to 11:00 p.m. (Tr. 60:7-17).

**(8)** On the occasions that Cortes was scheduled to work from 9:00 a.m. to 5:00 p.m., she actually worked from approximately 8:30 a.m. to 6:00 p.m. because Defendants required employees to arrive before the start of the shift and work past the end of the scheduled shift. (Tr. 64:2-25).

**(9)** Cortes was only paid for the scheduled hours of the shift, not the actual hours that she worked, *e.g.* from 9:00 a.m. to 5:00 p.m. rather than from 8:30 a.m. to 6:00 p.m. (Tr. 65:3-7).

**(10)** Cortes was paid in cash throughout her employment. (Tr. 66:19-20).

**(11)** Cortes was paid in cash without any accompanying paystub or any written documentation listing, *inter alia*, the hours she worked and wages she was being paid. (Tr. 66:21-25).

**(12)** Cortes did not receive any documents from Defendants at the time of her hiring or anytime thereafter listing, *inter alia*, her rate of pay. (Tr. 61:7-13).

**(13)** Cortes was not paid an additional hour of pay at the full minimum wage rate when she worked more than ten hours in one day. (Tr. 66:16-18).

**(14)** Cortes learned, during her employment, that male servers were being paid more than she and the other female servers were being paid.  Male servers received payment of $5.50 per hour, instead of $4.50 per hour. (Tr. 68:8-20).

**(15)** Cortes purchased four blouses from Defendants that she was required to wear as a uniform while employed by Defendants which cost her a total of $90.00. (Tr. 69:10-70:2).

**(16)** Defendants did not provide laundering services and laundry money for the blouses that Cortes purchased and was required to wear. (Tr. 70:3-6).

**(17)** Cortes was required to pay the bill for customers she served that left the restaurant without paying, as well as pay for food or drinks that customers returned to the kitchen.  In total, Cortes paid approximately $360: about $280 for food and $80 for beverages.  (Tr. 72:17-75:15).

**(18)** Defendant Mendez retained a portion of Cortes' tips on a regular basis. When Cortez worked Saturday and Sunday, she would make approximately $300 in tips and Mendez would pay her about $120. (Tr. 82:21-83:10). During the week, Cortes would make approximately $80 per day in tips and she would only receive approximately $50-55. (Tr. 83:16-24).

**b) <u>Plaintiff Leticia Gonzalez</u>**

**(1)** Plaintiff Leticia Gonzalez ("Gonzalez") worked for Defendants from mid-September 2015 to December 17, 2016. (Tr. 21:6-7).

**(2)** Gonzalez worked as a server for the majority of her time working for Defendants, but also worked as a cashier during approximately her last two months of employment. (Tr. 21:18-21).

**(3)** Gonzalez was paid $4.50 per hour when she worked as a server. (Tr. 21:13-17; 24:18-19).

**(4)** Gonzalez was paid $80-90 per shift when she worked as a cashier and the shift that she worked was from approximately 10:00 p.m. to 7:30 or 8:00 a.m. (Tr. 21:22-22:1).

**(5)** Gonzalez worked five to seven days per week while employed by Defendants. (Tr. 22:19-23).

**(6)** During her first two weeks of employment Gonzalez was scheduled to work five days per week during the daytime shift, which was from approximately 9:00 a.m. to 5:00 p.m. During the remainder of her employment she was generally scheduled to work the overnight shift. (Tr. 23:6-21).

**(7)** In or about the month of October 2015, Gonzalez was scheduled to work six days per week during the overnight shift, from approximately 11:00 p.m. to 6:00 a.m. (Tr. 23:8-21).[2]

**(8)** In or about November 2015, Gonzalez was scheduled work seven days per week during the overnight shift, from approximately 11:00 p.m. to 6:00 a.m. She worked this schedule until in or about April 2016. (Tr. 23:22-23:1, 22:19-23).

**(9)** From approximately April 2016 to December 2016, Gonzalez regularly worked the overnight shift six days per week. (Tr. 24:4-9).

**(10)** Defendants regularly required employees, including Gonzalez, to arrive before the start of the shift and work past the end of the scheduled shift. (Tr. 22:4-18).

---

[2] Throughout her testimony, Gonzalez testified that the overnight shift that she worked started at 10:00 p.m. In fact, the overnight shift started at 11:00 p.m. for all servers employed by Defendants. Gonzalez stated the incorrect shift start time.

3

**(11)** Gonzalez was only paid for the hours that she was scheduled to work, not the actual hours that she worked. (Tr. 26:18-27:22; 28:15-29:6).

**(12)** Gonzalez was paid in cash throughout her employment. (Tr. 24:24-25).

**(13)** Throughout the majority of her employment, Gonzalez was paid in cash without any accompanying paystub or any written documentation listing, *inter alia*, the hours she worked and wages she was being paid. During the final weeks of her employment she received a receipt showing the hours that she had been scheduled to work, but nothing further. (Tr. 25:1-3).

**(14)** Gonzalez did not receive any documents from Defendants at the time of her hiring or anytime thereafter listing, *inter alia*, her rate of pay. (Tr. 21:13-17).

**(15)** Gonzalez was not paid an additional hour of pay at the full minimum wage rate when she worked more than ten hours in one day. (Tr. 24:15-17).

**(16)** Gonzalez purchased eight blouses from Defendants that she was required to wear as a uniform while employed by Defendants which cost her a total of approximately $130 ($20 for five blouses and $10 for three blouses). (Tr. 32:2-23, 33:4-9).

**(17)** Defendants did not provide laundering services and laundry money for the blouses that Gonzalez purchased and was required to wear. (Tr. 32:24-33:3).

**(18)** Gonzalez was required to pay the bill for customers she served that left the restaurant without paying, as well as pay for food or drinks that customers returned to the kitchen. In total, Gonzalez paid approximately $400-500. (Tr. 33:10-34:17).

**(19)** Gonzalez did not always receive the tips left for her by customers. (Tr. 35:13-36:24).

**(20)** Gonzalez was not paid at all for her last four days of work. (Tr. 26:22-27:6).

c) **Plaintiff Ariana Reyes**

**(1)** Plaintiff Ariana Reyes ("Reyes") worked for Defendants from July 2016 to March 2017. (Tr. 89:16-17).

**(2)** Reyes was paid $4.50 per hour. (Tr. 90:18-19; 91:2-4).

**(3)** Reyes generally worked five to six days per week while employed by Defendants. (Tr. 91:12-13).

**(4)** During three weeks of Reyes' final month of employment, she worked four days per week and in her final week of employment, she worked three days. (Tr. 105:6-20).

4

**(5)** From July 2016 to November 2016, Reyes regularly worked the daytime or evening shifts, *i.e.* from 9:00 a.m. to 5:00 p.m. and/or from 5:00 p.m. to 11:00 p.m. (Tr. 106:11-16).

**(6)** From July 2016 to November 2016, Reyes worked the overnight shift approximately two times per month when she was covering a shift for another employee. (Tr. 106:24-107:5).

**(7)** From December 2016 to March 2017, Reyes worked the overnight shift, which was scheduled from 11:00 p.m. to 6:00 a.m. (Tr. 106:1-10).

**(8)** Reyes generally worked five days per week three weeks per month and six days per week one week per month. (Tr. 91:24-92:4).

**(9)** Reyes worked double shifts, the 5:00 p.m. to 11:00 p.m. shift and the 11:00 p.m. to 6:00 a.m. shift, approximately twice per month. (Tr. 92: 5-12).

**(10)** Reyes was only paid for the hours that she was scheduled to work, not the actual hours that she worked. (Tr. 93:15-94:15).

**(11)** Reyes was regularly required to work one to two hours past the end of her scheduled shift when she worked the overnight shift, which was scheduled from 11:00 p.m. to 6:00 a.m.  On those days she worked until 6:00 or 7:00 a.m. (Tr. 92:13-24).

**(12)** Reyes was required to arrive to work about twenty minutes before the start of her scheduled shift but was not paid for any time worked before the shift start time.  For example, when scheduled to work from 9:00 a.m. to 5:00 p.m., she would arrive about twenty minutes before the shift started but would only be paid as of 9:00 a.m. (Tr. 93:20-94:2).

**(13)** When Reyes worked the daytime shift, scheduled from 9:00 a.m. to 5:00 p.m., she usually worked up to two hours past the end of the shift until about 7:00 p.m., but was only paid until 5:00 p.m. (Tr. 94: 7-15).

**(14)** Reyes was paid in cash throughout her employment. (Tr. 96:7-8).

**(15)** Throughout her employment, Reyes was paid in cash without any accompanying paystub or any written documentation listing, *inter alia*, the hours she worked and wages she was being paid. (Tr. 96:16-18; 104:16-105:4).

**(16)** Reyes did not receive any documents from Defendants at the time of her hiring or anytime thereafter listing, *inter alia*, her rate of pay. (Tr. 90:10-15).

**(17)** Reyes was not paid an additional hour of pay at the full minimum wage rate when she worked more than ten hours in one day. (Tr. 95:18-20).

**(18)** Reyes learned, during her employment, that male servers were being paid more than she and the other female servers were being paid. Male servers received payment of $5.50 per hour, instead of $4.50 per hour. (Tr. 95:21-96:4).

**(19)** Reyes purchased five blouses from Defendants that she was required to wear as a uniform while employed by Defendants, which cost her a total of approximately $100. (Tr. 97:4-98:2).

**(20)** Defendants did not provide laundering services and laundry money for the blouses that Reyes purchased and was required to wear. (Tr. 98:3-7).

**(21)** Reyes was required to pay the bill for customers she served that left the restaurant without paying, as well as pay for food or drinks that customers returned to the kitchen. This generally occurred more than once a week and the bills she had to pay were approximately $30-40. (Tr. 98:8-99:3).

**(22)** Reyes did not always receive the tips left for her by customers. (Tr. 99:11-100:4).

**(23)** Reyes was not paid any wages during her one day of training at the start of her employment, which lasted from approximately 9:00 a.m. to 6:00 p.m. (Tr. 101:5-18).

d) **Plaintiff Blanca Nelly Reyes Ayala**

**(1)** Plaintiff Blanca Nelly Reyes Ayala ("Ayala") worked for Defendants from May 2016 to July 2017 (Tr. 5:17-18).

**(2)** Ayala was paid $4.50 per hour from the start of her employment through approximately June 2017 and then was given a raise to $7.50 per hour. (Tr. 6:2-5; 18:18-24); *see also* Inquest Exhibits 1 and 2.

**(3)** Ayala generally worked five to six days per week while employed by Defendants and kept contemporaneous notes throughout her employment listing her scheduled workdays. (Tr. 7:4-18); *see also* Inquest Exhibits 1 and 2.

**(4)** The notes kept by Ayala listed the hours that she was scheduled to work, not the hours that she actually worked. (Tr. 8:17-21).

**(5)** When Ayala was scheduled to work the daytime shift, scheduled from 9:00 a.m. to 5:00 p.m., she was required to arrive to work by approximately 8:30 a.m. (Tr. 11:1-11).

**(6)** When Ayala was scheduled to work until 11:00 p.m. she was required to work about an hour longer, until approximately 12:00 a.m. (Tr. 7:1-3).

**(7)** Ayala was paid in cash throughout her employment. (Tr. 13:24-25).

6

**(8)** Throughout her employment, Ayala was paid in cash without any accompanying paystub. She only received a receipt that listed the hours that she worked. (Tr. 14:3-18); Exhibit 11.

**(9)** Ayala did not receive any documents from Defendants at the time of her hiring or anytime thereafter listing, *inter alia*, her rate of pay. (Tr. 5:24-6:1).

**(10)** Ayala was not paid an additional hour of pay at the full minimum wage rate when she worked more than ten hours in one day. (Tr. 19:4-6).

**(11)** Ayala learned, during her employment, that male servers were being paid more than she and the other female servers were being paid, allegedly because the male servers had more experience. (Tr. 12:17-13:7).

**(12)** Ayala purchased five blouses from Defendants that she was required to wear as a uniform while employed by Defendants, which cost her a total of approximately $100. (Tr. 11:18-12:7).

**(13)** Defendants did not provide laundering services and laundry money for the blouses that Ayala purchased and was required to wear. (Tr12:8-13).

**(14)** Ayala was required to pay the bill for customers she served that left the restaurant without paying, as well as pay for food or drinks that customers returned to the kitchen. In total, Ayala had to pay an approximate total of $310. (Tr. 15:22-17:25).

**(15)** Ayala did not always receive the tips left for her by customers. (Tr. 18:6-17).

**(16)** Ayala was fired after the filing of the instant lawsuit. Defendants said that she could no longer work there because she was friends with the plaintiffs and because she was pregnant. (Tr. 15:12-18).

**e) Plaintiff Lucia Rivera**

**(1)** Plaintiff Lucia Rivera ("Rivera") worked for Defendants from September 19, 2016 to April 2017. (Tr. 39:1-4).

**(2)** Rivera was paid $4.50 per hour. (Tr. 42:2-3).

**(3)** Rivera generally worked six days per week while employed by Defendants. (Tr. 40:25-41:3).

**(4)** Rivera regularly worked up to an hour past the end of her scheduled shift. (Tr. 40:15-17).

**(5)** Rivera was regularly required to arrive up to thirty minutes before the start of her scheduled shift. (Tr. 40:18-24).

**(6)** During her first week of employment, Rivera worked five days per week during the daytime shift which was scheduled from 9:00 a.m. to 5:00 p.m. (Tr. 41:6-9).

**(7)** For approximately the next five weeks, *i.e.* the remainder of September and all of October 2016, Rivera worked six days per week during the daytime shift which was scheduled from 9:00 a.m. to 5:00 p.m. She also sometimes worked the evening shift, scheduled from 5:00 p.m. to 11:00 p.m. (Tr. 41:6-12).

**(8)** Starting in November 2016, Rivera worked the overnight shift, scheduled from 11:00 p.m. to 6:00 a.m. (Tr. 41:7-12).

**(9)** Rivera was regularly required to work until about 7:10 or 7:20 a.m. when she worked the overnight shift. (Tr. 41:18-23).

**(10)** Rivera was only paid for the hours that she was scheduled to work, not the actual hours that she worked. (Tr. 43:6-9).

**(11)** Rivera was paid in cash throughout her employment. (Tr. 42:14-15, 51:8-9).

**(12)** Throughout her employment, Rivera was paid in cash without any accompanying paystub or any written documentation listing, *inter alia*, the hours she worked and wages she was being paid. (Tr. 42:16-18, 51:10-23).

**(13)** Rivera did not receive any documents from Defendants at the time of her hiring or anytime thereafter listing, *inter alia*, her rate of pay. (Tr. 51:13-52:7).

**(14)** During her employment, Rivera spoke to a male server and learned that he and the other male servers were being paid more than she and the other female servers were being paid. (Tr. 43:13-25).

**(15)** Rivera purchased four or five blouses from Defendants that she was required to wear as a uniform while employed by Defendants, which cost her a total of approximately $95. (Tr. 44:22-45:19).

**(16)** Defendants did not provide laundering services and laundry money for the blouses that Rivera purchased and was required to wear. (Tr. 45:20-23).

**(17)** Rivera was required to pay the bill for customers she served that left the restaurant without paying. She estimates that during her employment she paid approximately $80. (Tr. 45:24-46:22).

**(18)** Rivera believes that Defendants sometimes misappropriated the credit card tips left for her. (Tr. 49:1-16).

**(19)** Rivera did not receive any wages for her final week of work. (Tr. 42:25-43:5).

**f) Proposed Findings of Fact Regarding Defendants**

**(1)** Juquila Mexican Cuisine Corp. is a New York corporation that does business as the restaurant, Juquila Mexican Cuisine ("Juquila"). *See* Complaint, ¶13[3]; Inquest Exhibit 17.

**(2)** Defendants Cristobal Bonilla ("Bonilla") and Teofila Mendez ("Mendez")[4] were owners of Juquila during Plaintiffs' employment. (Tr. 4:23-5:1; 20:17-21:5, 39:9-12, 39:16-20, 60:22-61:1, 89:21-25); Complaint ¶¶ 32, 39.

**(3)** Mendez was Plaintiffs employer and she exercised the authority to hire and fire employees, set wages, and establish and exercise authority regarding the managerial and administrative practices at the restaurant. (Tr. 5:22-23, 21:11-12, 42: 6-13, 61: 5-6, 50:1-6, 90:4-5, 99:11-19, 100:22-101:4, 103:6-104:2); Complaint ¶¶ 33-38.

**(4)** Bonilla was Plaintiffs employer and he exercised the authority to hire and fire employees, set wages, and establish and exercise authority regarding the managerial and administrative practices at the restaurant. (Tr. 15:12-16, 29:7-12, 37:14-16, 45: 2-5, 86: 15-22); Complaint ¶¶ 40-44.

**(5)** Upon information and belief, for each of the three years prior to the filing of the Complaint, Juquila Mexican Cuisine Corp. had an annual gross volume of sales in excess of $500,000. (Tr. 108:10-23), Inquest Exhibit 17, Complaint ¶16.

**2. Damages Calculations**

A detailed calculation of each Plaintiff's individual damages calculations is attached as Exhibit A.[5] In light of Defendants' failure to provide complete and accurate time and pay records, Plaintiffs must produce only "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference" to establish their hours and pay. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946).

---

[3] All references herein to "Complaint, ¶___," are to specific paragraphs of the Complaint filed in this action on June 30, 2017 (ECF No. 1).

[4] Defendant Teofila Mendez is referred to as Rosa throughout the inquest proceedings. Teofila and Rosa Mendez are one and the same. (Tr. 5:2-7, 20:19-25, 39:13-15, 61:1-4, 90:1-3).

[5] The damages calculations provided as Exhibit A show the liquidated damages that would be due under the FLSA, but only NYLL liquidated damages are included in the total.

a) **Minimum Wage Damages**

For minimum wage violations, Plaintiffs are entitled to the difference between the New York State statutory minimum wage rate and the effective hourly rate Defendants actually paid Plaintiffs, for all hours worked up to forty in each workweek during their employment at Juquila.  29 U.S.C. § 206; NYLL § 652; 12 N.Y.C.R.R. Part 146.

Plaintiffs are owed the difference between the full minimum wage at the time of their employment, and the payment of that they received. Plaintiffs were all paid $4.50 per hour during their employment but also, Plaintiffs Gonzalez and Ayala received a higher rate of pay during part of their employment.  *See* §§ 1(a)(6), 1(b)(3)-(4), 1(c)(2), 1(d)(2), 1(e)(2).  Furthermore, Defendants shaved time from Plaintiffs' wages, only paying them for their scheduled hours, not the actual hours they worked each week.  *See* §§ 1(a)(9), 1(b)(10)-(11), 1(c)(11)-(12), 1(d)(5)-(6), 1(e)(4)-(5).  Plaintiffs testified that they began work approximately 20-30 minutes before they scheduled shift and worked one to two hours past the end of their scheduled shift times.  *Id.* For the purposes of the damages calculations, we estimated that the Plaintiffs each worked 1.5 hours more than they were scheduled to work each day.  Also, when estimating the hours worked by Plaintiffs who asserted to have one of two different schedules, we found the average between the two totals and used that number (*e.g.* From in or about mid-April 2016 to July 2016, Cortes stated that she was scheduled to work six days per week during the daytime shift, from approximately 9:00 a.m. to 5:00 p.m. (a total of 48 hours), or six days per week during the evening shift, from approximately 5:00 p.m. to 11:00 p.m. (a total of 36 hours).  The average of the two schedules is 42 hours per week, which is what was used for the calculations.  For Plaintiff Ayala, we based the calculation of hours worked on her testimony and the information in Inquest Exhibits 1 and 2.

### b) Overtime Wage Damages

Under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"), Plaintiffs are entitled to overtime compensation one and one half (1½) times their regular hourly rate for each hour beyond forty per week. Plaintiffs were not paid above their regular hourly rate for the hours that they worked over forty. Therefore, for every week that they worked more than forty hours, they are owed the difference between the applicable overtime wage rate at the time of their employment and the payment that they actually received. *See* 29 U.S.C. § 207(a); 12 N.Y.C.R.R. § 146-1.4.

### c) Spread-of-Hours Wage Damages

Plaintiffs are entitled to spread-of-hours pay, *i.e.* one additional hour of pay at the basic minimum wage rate, for the days on which their shift spread more than ten hours, including break time. 12 N.Y.C.R.R. § 146-1.6. Plaintiffs did not receive any spread-of-hours pay when employed by Defendants. *See* §§ 1(a)(13), 1(b)(15), 1(c)(16), 1(d)(9), 1(e)(13); Complaint ¶¶ 59, 73, 83. For the purposes of the damages calculations, we assumed that Plaintiffs were entitled to spread-of-hours pay whenever they worked a double shift. For Plaintiff Ayala, we allocated spread-of-hours based on the hours listed in Inquest Exhibits 1 and 2.

### d) NYLL Wage Theft Prevention Act: Wage Notice Damages

Defendants failed to provide Plaintiffs with written notice containing the information set forth in NYLL § 195(1)(a). *See* §§ 1(a)(12), 1(b)(14), 1(c)(2), 1(d)(2), 1(e)(2). The wage notice requirement went into effect on April 9, 2011 and permitted recovery of $50 per week with a cap of $2,500. NYLL § 198(1-b). The provision was later amended to allow $50 per workday with a cap of $5,000 for violations after

11

February 27, 2015. *Id.* Because such notice was not provided to Plaintiffs, they are entitled to recover the maximum of $5,000 each for not receiving a wage notice upon hiring. or whenever their pay rate changed thereafter. *See* §§ 1(a)(13), 1(b)(15), 1(c)(16), 1(d)(9), 1(e)(13); Complaint ¶¶ 61, 75, 85.

  e) **NYLL Wage Theft Prevention Act: Wage Statement Damages**

Defendants violated the wage statement provision of the NYLL by failing to provide Plaintiffs with a written statement with each payment of wages containing the information set forth in NYLL § 195(3)(a). Following the amendment to NYLL § 198(1-b) in February 2015, the law entitles employees to recover liquidated damages of $250 per workweek that the violation occurred, up to a maximum of $5,000. Plaintiffs are each entitled to the maximum statutory damages of $5,000 each. *See* §§ 1(a)(11), 1(b)(13), 1(c)(15), 1(d)(8), 1(e)(12); Complaint ¶¶ 60, 74, 84.

  f) **NYLL & Supporting Regulations: Unlawful Deductions**

Plaintiffs were each required to purchase embroidered blouses to wear as part of their uniform when they worked. They are entitled to reimbursement of the costs to purchase, launder, and maintain their uniforms. NYLL § 193. For the purposes of the damages calculations, we credited each Plaintiff with the amount that they each remember paying for the uniform items.

Defendants' had a policy that required servers to pay the restaurant if a customer left without paying the bill or returned food to the kitchen. Plaintiffs each had to pay different amounts to cover customer bills and/or returns. Plaintiffs are entitled to reimbursement of the monies deducted from their wages to cover non-payment by customers and meals returned to the kitchen. NYLL § 193. For the purposes of the damages calculations, we included the estimates made by each Plaintiff but in the case of Plaintiff Reyes who could not remember, we calculated the average of the amounts

estimated by each of the other Plaintiffs and determined that she paid approximately $300.00 during her employment.

Plaintiffs are entitled to the gratuities left for them by customers during their shifts but retained by Defendants. NYLL § 196-d. Plaintiffs all believe that some amount of their gratuities was kept by Defendants rather than distributed to them. For the purposes of the damages calculations, we used Plaintiff Cortes' estimates for all Plaintiffs. § 1(a)(18) and estimated $120 estimated gratuities misappropriated during the weekend shifts and $25 in gratuities misappropriated each weekday shift. For example, a Plaintiff who worked five days would be owed $195.

### g)  NYLL Liquidated Damages

For violations of the NYLL, including minimum and overtime wages, spread-of-hours violations, and reimbursement of unlawful deductions and withheld gratuities, employees are presumed entitled to an equal amount in liquidated damages. NYLL § 663. Note that FLSA liquidated damages were calculated for illustrative purposes but were not included in the damages total.

### h)  Equal Pay Act Damages

Male servers at Juquila were paid more than Plaintiffs were paid. *See* §§ 1(a)(14), 1(c)(18), 1(d)(11), 1(e)(14). Plaintiffs are entitled to damages pursuant to the Equal Pay Act ("EPA") because Defendant paid the Plaintiffs at a lower wage rate than their male counterparts based solely on their sex, in violation of the FLSA as amended by the EPA. 29 U.S.C. § 206(d). Defendant Mendez's claim that the male servers were paid more due to their experience and English- speaking abilities was pre-text and inaccurate. In fact, at least two Plaintiffs testified to having similar experience and Plaintiff Cortes also speaks English fluently. (Tr. 13:3-23, 68:16-69:9). Plaintiffs are therefore entitled to these "amounts . . . which have been withheld" as if they were "unpaid minimum

13

wages or unpaid overtime compensation" under the FLSA. *Id.* In other words, Plaintiffs' EPA damages include the $1 pay differential, liquidated damages, attorneys' fees, and costs. *Id.* § 216; *Lavin-McEleney v. Marist Coll.*, No. 96-CV-4081, 1999 WL 33500070, at *2 n.1 (S.D.N.Y. Sept. 28, 1999) (noting that FLSA remedies are available for EPA violations).

At the inquest, the Court inquired as to whether EPA damages could be awarded *in addition* to the difference between their wages and the applicable statutory minimum wage rate when both Plaintiffs and their male counterparts were receiving less than the minimum wage rate. Counsel could not find any case law on point. However, a review of the legislative history of the EPA suggests that Plaintiffs may recovery EPA damages in addition to the minimum wages sought in § 2(a), *supra*.

"'Although the Equal Pay Act and the minimum wage provisions of the FLSA are located in the same section, [under subsections (a) and (d) of Section 206,] they are distinct provisions with different goals.'" *Perdue v. City Univ. of New York*, 13 F. Supp. 2d 326, 340–41 (E.D.N.Y. 1998) (quoting *Timmer v. Michigan Dep't of Commerce,* 104 F.3d 833, 843 (6th Cir. 1997)). Whereas the FLSA sought to insure that workers receive an amount of wages "Congress deems to be the minimum necessary for decency and basic human needs," "[t]he objective of [the EPA] [w]as to insure that those who perform tasks which are determined to be equal shall be paid equal wages," Senate Rep. 176-88, at 1 (1963). Congress bootstrapped the EPA's prohibition of sex-based pay discrimination onto the FLSA framework solely for administration efficiency, in order to "eliminate the need for a new bureaucratic structure." H.R. Rep. No. 309-88, at 2 (1963) (noting that "a simple expansion of that act to include the equal pay concept offers the most efficient and least difficult course of action.") There is no indication from the EPA's legislative history that Congress sought to substantively limit a discriminatee's recovery of the pay differential

14

by incorporating it within the FLSA structure or by labeling such a differential as "minimum wages" to be recovered. Indeed, to do so would also limit the efficacy of the pay discrimination prohibition in debunking the "ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same." Senate Rep. 176-88, at 1. Accordingly, the minimum wages due under the EPA may be added to any minimum wages awarded pursuant to 29 U.S.C. § 206(a).

Even if the Court awards Plaintiffs minimum wages under the higher state law minimum wage rate for Plaintiffs' First and Second Claims in the Complaint, that does not preclude a separate, additional award of so-called "minimum wages" under the EPA. Generally, to prevent double recovery "for the same injury," courts will award damages "under the statute providing the greatest amount of relief." *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 498 (S.D.N.Y. 2017), *aff'd,* 752 F. App'x 33 (2d Cir. 2018) (citations and internal quotation marks omitted). In other words, where a plaintiff establishes that her employer paid her less than the statutory minimum wage under both the FLSA and the NYLL, the higher wage rate will be applied in calculating damages. *See id.* However, because Plaintiffs' EPA claim is for a *different* injury—discrimination as opposed to wage theft—the "greater relief" principle does not preclude an award of damages for minimum and overtime wages under the NYLL and EPA damages under the FLSA's framework.[6]

---

[6] Although the FLSA deems EPA damages to be "unpaid minimum or unpaid overtime compensation," that is only "[f]or purposes of administration and enforcement." 29 U.S.C. § 206(d). Rather than amend Section 216 to reference EPA discrimination damages, Section 206(d) triggers its remedies by simply using the same nomenclature to describe the EPA discrimination damages. Because the characterization of discrimination damages as damages for unpaid wages is not substantive, and due to the different goals of the legislations, damages under the EPA should be considered as remedying a different injury than the minimum and overtime provisions of the FLSA and NYLL for purposes of calculating damages.

Plaintiffs concede, however, that liquidated damages may be awarded only under either the FLSA or the NYLL because, as the Second Circuit opined, they serve the same "dual punitive and compensatory" functions. *Chowdhury v. Hamza Express Food Corp.*, 666 F. App'x 59, 61 (2d Cir. 2016).

### i) Pre-judgment Interest Due

Plaintiffs are entitled to 9% annual pre-judgment interest on the wages owed to them. N.Y. C.P.L.R. § 5004; *see also Fu v. Pop Art Int'l, Inc.*, 10 Civ. 8562 (S.D.N.Y. Dec. 6, 2011) (holding that prejudgment interest may be awarded in addition to liquidated damages for violations of the NYLL).

### j) Post-judgment Interest Due

Pursuant to 28 U.S.C. § 1961, "interest shall be allowed on any money judgment in a civil case recovered in a district court" and should therefore be granted in any judgment rendered in Plaintiffs' favor.

### k) Attorneys' Fees and Costs

Plaintiffs are entitled to reasonable attorneys' fees and costs incurred in prosecuting this action. 29 U.S.C. § 216(b); NYLL §§ 198(1-b), (1-c), 651.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue a judgment in Plaintiffs' favor against Defendants in the amount of $252,123.48 plus pre- and post-judgment interest and attorneys' fees and costs.

Dated: New York, New York
      November 26, 2019

                              PECHMAN LAW GROUP PLLC

                        By:     *s/Laura Rodriguez*
                              Laura Rodriguez
                              Louis Pechman
                              Pechman Law Group PLLC
                              488 Madison Avenue, 17th Floor
                              New York, New York 10022
                              Tel.: (212) 583-9500
                              Fax: (212) 308-8582
                              rodriguez@pechmanlaw.com
                              pechman@pechmanlaw.com
                              *Attorneys for Plaintiffs*